UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BAI HAIYAN,                                    :
    PLAINTIFF,                             :
                                            :        CIVIL ACTION NO.:
                                            :        3:10-CV-767 (VLB)
                                            :
v.                                            :
                                            :
HAMDEN PUBLIC SCHOOLS, FRANCES                :
RABINOWITZ, HAMLET HERNANDEZ,                 :
KAROLYN RODRIGUEZ, AND                        :
THE COLLEGE BOARD                             :
    DEFENDANTS.                            :        JUNE 19, 2012

<u>MEMORANDUM OF DECISION GRANTING DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT [Dkt. #55]</u>

    Plaintiff, Bai Haiyan ("Haiyan"), an English language and literature professor from the People's Republic of China, brings this suit against Hamden Public Schools ("HPS" or "District"), the superintendent of HPS, Frances Rabinowitz ("Rabinowitz"), assistant superintendent, Hamlet Hernandez ("Hernandez"), the world language chair at HPS, Karolyn Rodriguez ("Rodriguez"), and the College Board, a New York non-profit Corporation with a Chinese Guest Teacher Program.  Haiyan brings a variety of claims against the Defendants stemming from her placement for a single school-year term in the Hamden Public Schools as a Chinese language teacher in a guest teacher exchange program, including claims of discrimination on account of national origin in violation of the Equal Protection Clause of the Fourteenth Amendment, 42 U.S.C. §§1981, 1983, 1985, 1988, Title VII of the Civil Rights Act of 1964, and Connecticut General Statutes Sections 46a-100 and 46a-60, Substantive and

1

Procedural violations of the Due Process Clause of the Fourteenth Amendment and a violation of Conn. Gen. Stat. §46a-58, breach of contract, tortious interference with contractual relations, and retaliation in violation of the First Amendment as enforced through 42 U.S.C. §1983 and 1988 and Conn. Gen. Stat. §31-51q.

Currently pending before the Court is a Motion for Summary Judgment filed by Defendants Rabinowitz, Hernandez, Rodriguez, and Hamden Public Schools expressly pursuant to Fed. R. Civ. P. 56.

<u>Factual Background</u>

Plaintiff, Bai Haiyan, a Chinese citizen and a professor of British and American literature at a Chinese university, was accepted in April 2009 as a Chinese Guest Teacher by Hanban and the College Board. [Dkt. #56, Def. Rule 56(a)(1) Stmt., ¶1]; [Dkt. #64, Ex. 1, Pl. Stmt. Of Disputed Facts, ¶12]. Hanban is a Chinese non-profit organization affiliated with the Chinese Ministry of Education which works in conjunction with the College Board, a United States non-profit association, to place Chinese teachers into schools in the United States as Chinese language teachers through a Guest Teacher Program. [Dkt. #64, ¶6]; [Dkt. #56, Ex. 1, Pl. Rule 56(a)(2) Stmt., ¶6]. Hamden Public Schools participated in the College Board and Hanban's Chinese Guest Teacher Program during the 2009-2010 school year, relying on the College Board to interview, screen and select Chinese teachers and identifying two teachers for assignment to HPS. [Dkt. #56, ¶¶3-4].

The Chinese Guest Teacher Program is an international cultural exchange visitor program established pursuant to the Mutual Education and Cultural Exchange Act of 1961 (the "Cultural Exchange Act") also known as the Fulbright-Hays Act of 1961 whose purpose "is to enable the Government of the United States to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange; to strengthen the ties which unite us with other nations by demonstrating the educational and cultural interests, developments, and achievements of the people of the United States and other nations, and the contributions being made toward a peaceful and more fruitful life for people throughout the world; to promote international cooperation for educational and cultural advancement; and thus to assist in the development of friendly, sympathetic, and peaceful relations between the United States and the other countries of the world."  22 U.S.C. §2451, et seq. (1988).  The  Cultural Exchange Act empowers the Department of State to authorize exchange visitor programs "which provide opportunities for international candidates to teach, study, conduct research, demonstrate special skills or receive on the job training for periods ranging from a few weeks to several years." http://j1visa.state.gov/programs (last visited June 12, 2012).

A J-1 exchange visitor nonimmigrant visa is "provided for persons who are approved to participate in exchange visitor programs in the United States" ("J-1 Visa") established pursuant to the Cultural Exchange Act. http://travel.state.gov/visa/temp/types/types_1267.html (last visited June 12, 2012); *see also*, 8 U.S.C. §1101(a)(15)(J) ("an alien having a residence in a foreign

country which he has no intention of abandoning who is a bona fide student, scholar, trainee, teacher, professor, research assistant, specialist, or leader in a field of specialized knowledge or skill, or other person of similar description, who is coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training").

The State Department promulgated regulations to implement the Cultural Exchange Act and administer exchange visitor programs established pursuant to the Act. *See* 22 C.F.R. §62. Under these regulations and the Act, the Secretary of State of the State Department designates legal entities known as "sponsors" to conduct exchange visitor programs. *See* 22 C.F.R. §62.2. Under the regulations sponsors are "responsible for the effective administration of their exchange visitor programs," including the screening and selection of exchange visitors for program participation. The sponsors are also obligated to "monitor, through employees, officers, agents or third parties, the exchange visitors participating in their programs" including "monitor[ing] the progress and welfare of the exchange visitor to the extent appropriate for the category." *Id.* at §62.10.

With respect to teacher exchange visitor programs, the regulations provide that:

> Programs under this section promote the interchange of American and foreign teachers in public and private schools and the enhancement of mutual understanding between people of the United States and other countries. They do so by providing foreign teachers opportunities to teach in primary and secondary accredited educational institutions in the United States, to participate actively in cross-cultural activities with Americans in

> schools and communities, and to return home ultimately to share their experiences and their increased knowledge of the United States. Such exchanges enable visitors to understand better American culture, society, and teaching practices at the primary and secondary levels, and enhance American knowledge of foreign cultures, customs, and teaching approaches.

*Id.* at §62.24.  A foreign national is eligible to "participate in an exchange visitor program as a full-time teacher if the individual: (1) Meets the qualifications for teaching in primary or secondary schools in his or her country of nationality or last legal address; (2) Satisfies the standards of the U.S. state in which he or she will teach; (3) Is of good reputation and character; (4) Seeks to come to the United States for the purpose of full-time teaching at a primary or secondary accredited educational institution in the United States; and (5) Has a minimum of three years of teaching or related professional experience."  *Id.*  Sponsors are obligated to adequately screen teachers prior to accepting them for the program.  *Id.*

"Prior to the issuance of the Form DS–2019, the exchange visitor shall receive a written offer and accept in writing of a teaching position from the primary or secondary accredited educational institution in which he or she is to teach. Such position shall be in compliance with any applicable collective bargaining agreement, where one exists. The exchange visitor's appointment to a position at a primary or secondary accredited educational institution shall be temporary, even if the teaching position is permanent."  *Id.*  Lastly, "the teacher shall be authorized to participate in the Exchange Visitor Program for the length of time necessary to complete the program, which shall not exceed three years."  *Id.*

An exchange visitor's participation in the program is expressly subject to termination.  The regulations provide that a sponsor shall terminate an exchange visitor's participation in its program when the exchange visitor is unable to continue, unless otherwise exempted pursuant to these regulations or violates the Exchange Visitor Program regulations and/or the sponsor's rules governing the program, if, in the sponsor's opinion, termination is warranted. *Id.* at §62.40. An exchange visitor's participation in the Exchange Visitor Program is also subject to termination when he or she engages in unauthorized employment.  *Id.* Upon establishing such violation, the Department of State shall terminate the exchange visitor's participation in the Exchange Visitor Program.  *Id.* at §62.40.  In addition, an "exchange visitor who willfully or negligently fails to comply with the requirements established in Public Law 104–208, as amended, shall be terminated from the Exchange Visitor Program by the sponsor."  *Id.* at §62.78.

The regulations contemplate that a "citizen or national of a foreign country who has been awarded a grant to lecture, teach and engage in research may be entitled to certain benefits when authorized" by the Department of State such as transportation and per diem allowance.  *Id.* at §63.4.  In addition, an "exchange visitor may receive compensation from the sponsor or the sponsor's appropriate designee for employment when sure activities are part of the exchange visitor's program." *Id.* at §62.16.

The College Board and Hanban jointly collaborate as sponsors of the Chinese Guest Teacher Program.  HPS and the College Board entered into a Memorandum of Understanding ("MOU") to memorialize the terms of their

arrangement under the Guest Teacher Program and renewed this agreement to apply to the 2009-2010 school year. *Id.* at ¶5.

The MOU indicated that the College Board, in cooperation with the District, selected the Institute of International Education ("IIE") to sponsor the Chinese Guest Teacher's J-1 Exchange Visitor Visa and that IIE and the College Board entered into a J-1 Visa sponsor agreement pursuant to which IIE would sponsor the Chinese Guest Teacher in connection with the Chinese Guest Teacher Program.  [Dkt. #57, Ex. 1, MOU].

Pursuant to the MOU, HPS was obligated to (i) "furnish each Chinese Guest Teacher with a temporary, full-time teaching position;" (ii) "issue a validly signed offer letter to each Chinese Guest Teacher that contain[ed] terms and conditions no less favorable than those set forth in the template attached" which included, the total compensation amount to be provided to the Chinese Guest Teacher, work assignments, start date and end date of position and designation of school sites; (iii) "provide the College Board and/or IIE with semi-annual progress reports from each participating school regarding whether the Chinese Guest Teacher Program objectives are being met;" (iv) "fund J1 visa processing and health insurance fees for each Chinese Guest Teacher for the duration of the Chinese Guest Teacher Program;" (v) "provide and pay for each Chinese Guest Teacher's housing (with basic utilities); (vi) "provide and pay for each Chinese Guest Teacher's local transportation;" (vii) "collaborate with the College Board to confirm that the Chinese Guest Teacher meets the legal standards and requirements for teaching in the state, county and school in which the Chinese

Guest Teacher will teach;"(viii) "certify that the Chinese Guest Teacher will not permanently replace full or part-time employees, and that the participation in the Chinese Guest Teacher Program does not lead to recruiting and training non-citizens for permanent employment in the United States;" and (ix) "inform the College Board of the number of international visiting teachers presently working in the institution." [Dkt. #57, Ex. 1, Mem. of Understanding, ¶¶1.1.1 – 1.1.11].

In addition, HPS under the MOU agreed to "pay each Chinese Guest Teacher an annual compensation." [*Id.* at ¶3.3.1]. HPS was obligated to "furnish an aggregate compensation: (i) that is commensurate with compensation received by those teachers employed by the District with responsibilities and similar education in each specific school district where the Chinese Guest Teacher is placed… and (ii) complies with any applicable collective bargaining agreements." [*Id.* at ¶4.1]. Haiyan zealously denies that the obligation to furnish housing and base utilities constituted a piece of the overall compensation to be provided to the Guest Teachers, however this fact is not relevant to any claim remaining on contention and therefore is immaterial. [Dkt. #64, Ex. 1, Pl. Rule 56(a)(2) Stmt., ¶7].

The MOU indicated that Hanban had agreed to make certain financial contributions to the Chinese Guest Teacher Program. Hanban was obligated to "provide each Chinese Guest Teacher a $1000.00 monthly stipend and an additional $1000.00 for the first month." [*Id.* at ¶3.2.1]. In addition, Hanban was to "provide each Chinese Guest Teacher one annual roundtrip ticket for an international flight between Chine and the U.S." [*Id.* at ¶ 3.2.2]. The MOU also

8

provided that HPS "may combine the value of non-monetary benefits, such as housing and transportation … with the Hanban Stipend and direct compensation paid by the [HPS] to meet the aforementioned minimum compensation requirement" under Section 4.1 of the MOU.  [*Id.* at ¶4.1].

Pursuant to the MOU, the College Board was obligated to (i) in collaboration with Hanban "select the Chinese Guest Teacher through document review and individual interviews assessing pedagogy, classroom management skills, cultural tolerance, and language proficiency;" (ii) "organize pre-departure orientation on American culture and education system;" and (iii) "maintain regular communication with the Chinese Guest Teacher and monitor their work progress."  [*Id.* at ¶¶ 1.2.1-1.2.3].

Under the MOU, HPS also "acknowledge[d] that Hanban monitors and requires reporting from the College Board regarding its activity and compliance under the Grant" and "[a]s such, [HPS] agree[d] to provide College Board with complete and accurate documentation pertaining to the Chinese Guest Teachers [conduct and performance] and/or copies of any information that Hanban may reasonably request."  [*Id.* at ¶6].

The MOU provided that the College Board may terminate the MOU upon 60 days written notice to HPS without any liability "upon misconduct, unsatisfactory performance pursuant to the District's employment policies and procedures of a Chinese Guest Teacher; failure of a Chinese Guest Teacher to complete the teaching position because of voluntary termination, including premature departure; Chinese Guest Teacher engaging in unauthorized income-producing

activities; or other activities that in the judgment of IIE and/or the College Board are inconsistent with the purposes and best interests of the Chinese Guest Teacher Program." [*Id.* at ¶8.1.5].  HPS may terminate the MOU upon 60 days written notice to the College Board without any liability upon "unsatisfactory performance (pursuant to District's employment policies and procedures) of a Chinese Guest Teacher; Chinese Guest Teacher engaging in unauthorized income-producing activities; or other activities that in the judgment of IIE and/or the College Board are inconsistent with the purposes and best interests of the Chinese Guest Teacher Program."  [*Id.* at ¶8.2.3].  In addition, HPS may terminate the MOU immediately with written notice to College Board without any further liability upon the "misconduct of Chinese Guest Teacher or violation of federal, state or local laws."  [*Id.* at ¶8.2.4].

Pursuant to the Section 1.1.2 of the MOU, HPS issued a "validly assigned Offer Letter" to Haiyan in the form of the template attached as Appendix A to the MOU.  [Dkt. #56, Ex. 1, Def. Stmt. Of Undisputed Facts, ¶¶7-9].  On May 21, 2009, Haiyan received the offer letter from HPS which stated that it was a "Letter of Appointment for Ms. Bai Haiyan."  [Dkt. #64-6, Pl. Ex. E].  The letter provided that "the rate per year for full time employment for two teachers" was  $26,967, itemized as follows: U.S. Salary: $26,967 per teacher; Housing Benefits: $8,500; Transportation/Miscelleaneous: $1,000.  [*Id.*]. The letter indicated that the "[p]eriod of proposed employment will be from August 24, 2009 to June 15, 2010" and that the "job title for this position is Chinese teacher.  The classes to be taught are Introduction to Chinese I and Chinese II."  The letter also indicated that

the total compensation offered was "commensurate with compensation received by those teachers employed with Hamden with responsibilities and similar education in Hamden where Bai Haiyan is placed."  [*Id.*].  To support her breach of contract claim, Haiyan asserts that this "Appointment Letter" constituted a valid and enforceable employment contract with HPS subject to termination only for just cause.

To substantiate her assertion that the Letter constituted an employment contract, Haiyan asserts that Defendant Hernandez, the author of the letter, had the authority to enter into "just cause" employment contracts on behalf of HPS, noting that the job description of the "Assistant Superintendent of Personnel and Administration" states that the assistant superintendent "supervises recruitment of all school district employees." *Id.*  Further, Haiyan asserts that the Superintendent, Defendant Rabinowitz, was authorized to designate an official to "determine the personnel needs of the school district and to hire suitable candidates for all positions." [Dkt. #64, Pl. Ex. F].  Haiyan proffers an email from Defendant Rabinowitz to Defendants Rodriguez and Hamlet stating that Hamlet would be "a better judge" of which of three potential compensation packages to the two Guest Teachers would be the most appropriate for HPS to provide as proof that Rabinowitz named Defendant Hernandez, her Assistant Superintendent, as her designee to hire teachers through the Chinese Guest Teacher Program. [Dkt. #64, Ex. 1, Pl. Stmt. of Disp. Issues of Mat. Fact, ¶4].

Defendants dispute this assertion, arguing principally that Defendant Hamlet Hernandez, as the Assistant Superintendent lacked the authority to hire

"just cause" employees.  Rather, Defendants assert that the job description of the Assistant Superintendent as set forth by HPS authorized him only to "supervis[e] recruitment of all school district employees," and to "supervis[e] procedures for selection and employment of all school district employees, ensuring that interview committees, reference checks and all forms used in the application process are in keeping with good educational and management practices and in accordance with legal requirements." [Dkt. #57, Def. Ex. D].

Prior to their arrival in Connecticut before the beginning of the 2009-2010 school year, HPS rented an apartment for Haiyan and the other Chinese Guest Teacher selected to work at HPS, Li Li.  They  were greeted at the airport by Defendant Karolyn Rodriguez and transported to the apartment. [Dkt. #56, Def. Rule 56(a)(1) Stmt., ¶10].

On December 20, 2009, Defendant Rodriguez received a call from Li Li who reported that she and Haiyan and had a physical fight causing her injury. *Id.* at ¶¶11-12. Li Li further stated that the police had arrived at the apartment and had placed Haiyan under arrest. *Id.* Defendant Rodriguez notified Defendant Rabinowitz, the Superintendent of HPS of the physical altercation that had taken place between Haiyan and Li resulting in Haiyan's arrest. *Id.* at ¶12.  On Monday morning, Defendant Hernandez contacted the Hamden Police Department to inquire as to the incident at the Guest Teachers' apartment and the Police Department confirmed that they responded to the apartment, arrested Haiyan, and took her into custody. *Id.* at ¶13.   Haiyan was arrested on charges for disorderly conduct and assault.  [Dkt. #57-7. Ex. G].  The case incident report

stated that Officer Derek Manning investigated a report of a domestic dispute between Li Li and Haiyan.  [*Id.*]. The Officer observed that Li Li had a fresh laceration over her right eye and that Bai had no physical injury.  [*Id.*].  As a part of the case incident report, Li LI provided a sworn statement detailing the altercation.   [*Id.*].

Later on Monday December 21, 2009, Defendants Hernandez and Rodriquez then visited the middle school to speak to Li Li and noticed that she had lacerations on her face appearing to be significant. [Dkt. #56, Def. Rule 56(a)(1) Stmt., ¶14].  The Defendants photographed Li Li's face in its injured state and asked her to prepare a type-written statement summarizing the altercation with Haiyan. *Id.* at ¶¶15-16.  Li Li prepared her statement alone in a private office in the middle school without any prior discussion as to the suggested contents of the statement. *Id.* at ¶¶17-18. Li Li's statement summarized the incident as follows:

> It was December 20th, I just got home from New York. I put my wet boots in front of the air conditioner, and my roommate Bai Haiyan was unsatisfied and unhappy with this. She ordered me to move my shoes away, but I said I wouldn't do that because they are wet. Several minutes later, she went to the kitchen and said to me that I had better throw out the trash bag right away. I said I was away for the whole weekend, and asked why she couldn't throw that since she's also a member of this apartment. I think this set her off. She opened my door to the bedroom and threw the trash bag into my bedroom, and said since I'm ok with the trash, why don't I stay with them? I was angry, and took the bag out of my bedroom. She kept swearing at me, so I answered back. Then suddenly, she started to hit me. I could do nothing but defend myself, so we had a fight. During the fight, she pushed me onto the floor twice, once in the kitchen and the other near the closet. She even sat on

me when I was lying on the floor. After the fight, she
didn't stop swearing at me. When I checked myself in
the bathroom, I realized my face was scratched. There
are many wounds on my face, and one that is closest to
my left eye was bleeding. I also got many bruises all
over the body. My right ankle was twisted and swollen.
*Id.* at ¶19.

Defendants allege that Hernandez then contacted the College Board to

notify them of the altercation and of Haiyan's arrest. [Dkt. #56, Def. Rule 56(a)(1)

Stmt., ¶21].  Haiyan asserts that in fact the College Board was already aware of

the altercation, and contacted Defendants Rabinowitz, Hernandez, and Rodriguez

on the morning of Monday, December 21, 2009 to ask if they needed any help with

the situation. [Dkt. #64, Ex. 1, Pl. Rule 56(a)(2)Stmt., ¶20].

Defendants assert that later that day, Monday December 21, 2009,

Defendant Hernandez went to the high school to meet with Haiyan. [Dkt. #56, Def.

Rule 56(a)(1) Stmt., ¶21].  Haiyan asserts that the Defendants did not meet with

her until the following day, Tuesday December 22, 2009. [Dkt. #64, Ex. 1, Pl. Rule

56(a)(2) Stmt., ¶21].

In the afternoon of December 22, 2009, Defendant Rodriguez led Haiyan

from her into a room with Defendant Hernandez. [Dkt. #64, Pl. Ex. 8, Haiyan Dep.,

101:5-12].  Defendant Hernandez began the meeting by asking Haiyan, "So why

were you the only one to be taken to the police station." *Id.* at 101:14-16.  Haiyan

responded by stating, "I guess the crying baby gotta the food, gets the food?" *Id.*

at 101:16-18.  Haiyan asserts that this was the only instance in which the

Defendants asked her to explain her perspective of the altercation. *Id.* at 101:18-

19 and 105:17-25; *see also* [Dkt. #64, Ex. 1, Pl. Rule 56(a)(2) Stmt., ¶¶22,23].

Haiyan asserts that she "really would love to" tell her version of the altercation, but absent a "sign or signal or any gesture that he want to listen to it," she was "not encouraged to tell the story." [Dkt. #64, Ex. 8, Haiyan Dep., 107:1-4].

Defendants refute the assertion that Haiyan was not given the opportunity to discuss her version of the fight with Li LI, arguing that Haiyan was asked a series of questions during the meeting on December 22, 2009, which provided her with the ability to elaborate as to her perspective on the fight. Specifically, Defendants assert that Haiyan was asked about the subject of the argument, whether she had laid a hand on Li Li, how Li Li received the lacerations to her face, and whether  the police came to the house that night. [Dkt. #56, Def. Rule 56(a)(1) Stmt., ¶¶22-26].

Defendant Hernandez asserts that in responding to these questions, it appeared that Haiyan felt justified by her actions and that she viewed her roommate as "weak" and "whiney." *Id.* at ¶27.  Haiyan denies that she insinuated that Li Li was "weak" and "whiney." [Dkt. #64, Ex. 1, Pl. Rule 56(a)(2) Stmt., ¶27]. It was reported in the police incident report that Bia stated that "she got mad at Li because it was her turn to take out the garbage and she hadn't done so yet.  That during the argument with Li, Li walked toward Bai so Bai started hitting Li out of fear for her own safety…that she was scared of Li because Li is taller than her." [Dkt. #57, Ex. G].  It was noted in the police incident report that Bai had no physical injury.  [*Id.*].  Defendant Hernandez asserts that he was "appalled by her lack of remorse and her callous attitude after the assault" and concluded that Haiyan was lying. *Id.* at ¶¶29-30.

During the meeting on December 22, 2009, Defendant Hernandez informed Haiyan that she would need to make alternative living arrangements and would no longer be permitted to live with Li Li. [Dkt. #64, Ex. 1, Pl. Rule 56(a)(2) Stmt., ¶31].  Hernandez then asked Haiyan about her plans for the upcoming school vacation.  *Id.* at ¶32.  Haiyan stated that she had plans to travel to Iowa. [Dkt. #64, Ex. 8, Haiyan Dep., 101:24-25].  Haiyan asserts that Hernandez then instructed Haiyan to pack her personal belongings and not to return to the school the next day, Tuesday, December 23, 2009, as a "cooling off period," stating that he would "find a new apartment for you to move into and this new apartment will be paid for by Hamden Public Schools." *Id.* at 102:9-14.

Following receipt of the police report of the altercation Defendants assert that Hernandez and Rabinowitz discussed the contents of the report and decided to inform the College Board of the incident and to request that Haiyan's position as a guest teacher for HPS be terminated. [Dkt. #56, Def. Rule 56(a)(1) Stmt., ¶36]. Defendants further assert that their decision to terminate Haiyan was predicated upon the following facts and information:

a. The information in the police report
b. The apparent significance of Li Li's facial lacerations
c. The contents of Li Li's written statement
d. Haiyan's arrest
e. Haiyan's lack of an explanation for Li Li's injuries
f. Haiyan's attitude at the December 22, 2009 meeting *Id.* at ¶36.

Defendants assert that the foregoing information led them to conclude that Haiyan's conduct could not comport with Hamden Board of Education Policy No. 4118.23/4218.23, requiring staff to deal effectively with students, parents and other staff members. *Id.*  Further, Defendants had "serious concerns about

**16**

Haiyan's fitness to be placed in a position of trust with students." *Id.*  Defendants assert that these concerns and doubts received further validation from Haiyan's admission that probable cause existed for her arrest. *Id.* at ¶39.

Haiyan disputes the Defendants' assertion that the decision to terminate her was made following her arrest.  Haiyan asserts that prior to the altercation, communications between the Defendants at HPS and the College Board had already been exchanged regarding a desire to have her terminated.  In particular, Haiyan asserts that on December 19, 2009, two days prior to the fight between Haiyan and Li Li, Defendant Rabinowitz notified a member of the HPS School Board that HPS had been having difficulties with Haiyan as a result of her compensation. [Dkt. #64, Ex. 1, Pl. Rule 56(a)(2) Stmt., ¶20].

In October 2009, a few months after she began teaching at HPS, Haiyan met with Gary Highsmith, the Principal of Hamden High School, to inquire about her pay, reporting that between August 24, 2009 and October 9, 2009, she had not received a single paycheck and was struggling to pay for her food and transportation. *Id.*  at ¶¶20-21.  On October 9, 2009, Haiyan received her first paycheck.  [Dkt. #64, Ex.1, Pl. Stmt. of Disp. Facts, ¶24].  Concerned that she was being underpaid, Haiyan again approached Principal Highsmith. *Id.* at ¶25.

On October 13, 2009, Defendant Rodriguez, the World Language Chair of HPS emailed Defendant Rabinowitz, the Superintendent of HPS, and Defendant Hernandez, the Assistant Superintendent, and notified them that "the Chinese teachers are a big [sic] agitated with their salary," and that the teachers were "going to contact central office about this." *Id.* at ¶26.

After again discussing her concerns about her compensation with Defendant Rodriguez and Michael Belden, the Business Manager of HPS, Haiyan hired an attorney who began to contact HPS on her behalf regarding the compensation dispute. *Id.* at ¶¶ 27-31.  Haiyan's attorney never received a response from any HPS officials. *Id.* at ¶¶31-40.

On December 9, 2009, Defendant Rabinowitz instructed Defendant Hernandez "Let's post the position for the Chinese Teachers now." [Dkt. #64, Ex. 6, p. 24].  Acting upon this request, on December 10, 2009, Defendant Hernandez emailed Ann Lucarelli and stated "We haven't spoken about this yet, but the District is going to post this on our Website as an anticipated position." *Id.*  On December 16, 2009, Defendant Hernandez emailed Rabinowitz and confirmed that "[t]he Chinese position is posted and I understand that we received a letter from the attorney. All is well." *Id.* at p. 27.  Rabinowitz responded to Hernandez that she would "track down the person in College Board to speak about the Chinese program- the nerve of that teacher!" *Id.*

On December 20, 2009, Defendant Rabinowitz emailed a member of the Hamden Board of Education and stated as follows:

> Just wanted to let you know that we have been having some issues with the Chinese teacher at HHS- not teaching issues but some issues with her compensation which had been taken care of with College board.. She is still not happy. Mike Belden met with her several times and we thought that it was taken care of; College Board was also in the loop. I received another letter from an attorney on her behalf (an associate of Al Oneto from HHS) last week. I called College Board on Friday and said that this was unacceptable. They want her out as well.

18

> I just received a call a few minutes ago saying that she assaulted the other Chinese teacher (they share an apartment) and the police were called. Evidently, she scratched, hit and broke the other teacher's glasses.
>
> Karolyn Rodriguez is in touch with the teacher who was assaulted. I am working with Hamlet on this.
>
> We will be calling College Board tomorrow. BAI, the HHS teacher needs to be gone. The issue is finding a substitute. I intend to put pressure on College Board. They should be doing thorough screenings and I am not sure how this one made it through. I will also be in touch with Tim Nottoli. He may have some leads for a sub in fact, his wife may be interested. Honestly, you can't make these things up. I will keep you updated. *Id.* at p. 28.

On Monday December 21, 2009, Carol Lin of College Board emailed Defendant Rabinowitz and stating that she was aware that the two Chinese Guest Teachers had gotten into a physical fight and offering to "continue our discussion from last Friday regarding a decision about Bai Haiyan." [Dkt. #64, Ex. 6, p. 29]. Carol Lin then emailed Defendant Hernandez requesting documentation relating to Haiyan, including a police report or statement, and requesting that the letter "specify the date and reason her employment with the district will end." *Id.* at p. 30.

Later on Monday December 21, 2009, Carol Lin emailed Rabinowitz and Hernandez and stated:

> Thank you for talking to me on the phone about the letter. We have discussed and agreed to the following changes.
>
> As per section 8.1.5 of the College Board Chinese Guest Teacher Program Memorandum of Understanding, Hamden Public Schools requests the College Board to

> **terminate Bai Haiyan's guest teacher contract with Hamden Public Schools………..**
>
> **Delete the language "In addition, Hamden Public Schools shall continue to honor the financial agreement in place, provided that a replacement teacher is……for this service."** *Id.* **at p. 31.**

At 9:47 P.M. on December 21, 2009, Defendant Rabinowitz to Defendant Hernandez and Michael Belden, the Business Director of HPS thanking them "for coming together to problem solve the Chinese teacher issue. I really felt the synergy and support of a great team. I am very fortunate." [Dkt. #64, Ex. 6, p. 33].

A letter dated December 22, 2009 was sent from Defendant Rabinowitz to Carol Lin at College Board stating:

> **Dear Ms. Lin,**
>
> > **As per our conference call this morning, this letter outlines the actions that will be taken in reference to the teaching assignment of Bai Haiyan, Chinese Guest Teacher at Hamden High School.**
> >
> > **Unfortunately and regrettably, Bai Haiyan's conduct is both unprofessional and distressing. As per section 8.1.5 of *The College Board Chinese Guest Teacher Program Memorandum of Understanding*, We request that The College Board will terminate Bai Haiyan's guest teacher contract with Hamden Public Schools on the basis of misconduct and her arrest by the Hamden Police Department on December 20, 2009. The termination shall be effective December 23, 2009. Enclosed, please find the supporting documentation verifying the claim.**
> >
> > **I understand that the College Board will immediately work to provide another Chinese teacher for Hamden High School. Every effort will be made to fill this position as soon as possible to ensure the continuity of**

instruction for our students enrolled in the Chinese
course.

Thank you for your cooperation and immediate attention
to this important matter. *Id.* at p. 35.

On December 22, 2009, College Board notified Haiyan that her position as a
guest teacher with HPS had been terminated. [Dkt. #64, Ex. 1, Pl. Rule 56(a)(2)
Stmt., ¶40]. Haiyan was then instructed to make arrangements to return to China
within thirty days of her termination to avoid overstaying her visa and a potential
criminal investigation by the Department of Homeland Security. *Id.* at ¶41.

On January 9, 2010, Haiyan's petition to the Hamden Board of Education
for a hearing regarding her employment status with the District was denied. [Dkt.
#64, Ex. 10, ¶85].

## Procedural History

On September 27, 2010, Defendants filed motions to dismiss Haiyan's
Amended Complaint. On July 15, 2010, the Court granted Defendant College
Board's motion to dismiss and the Parties subsequently filed a Stipulation of
Dismissal of the College Board on October 14, 2010. All claims against the
College Board were thereby dismissed from this case.

The Court's September 27, 2010 ruling on the pending motions to dismiss
sufficiently narrowed the claims alleged. The Court dismissed Haiyan's First
Amendment Retaliation claims raised pursuant to 42 U.S.C. §§1983, 1988, and
Conn. Gen. Stat. §31-51q, discrimination on the basis of alienage claims raised
pursuant to 42 U.S.C. §1981 and Conn. Gen. Stat. §§46a-58 and 46a-100,
employment discrimination claim under the Equal Protection Clause of the

Fourteenth Amendment as enforced by 42 U.S.C. §1983, and employment discrimination claim raised pursuant to 42 U.S.C. §1981. [Dkt. #42, Mem. of Decision].

Haiyan's Memorandum in Opposition to Defendants' Motion for Summary Judgment concedes that "the [C]ourt's memorandum of decision with respect to Defendants' motion to dismiss dated July 15, 2011 disposes of the Plaintiff's claims that Defendants (1) violated her right to the equal protection of the laws, (2) violated her rights under Title VII, (3) violated her rights under 42 U.S.C. §1981, and (4) violated her rights under the First Amendment of the United States Constitution."  [Dkt. #64, Mem. in Opp. to Mot. for SJ, p. 1].  Haiyan therefore concedes that to the extent that such claims remain extant following the Court's disposition of the motions to dismiss, Defendants' motion for summary judgment as to those counts should be granted.

Accordingly, the sole claims remaining in contention at this summary judgment phase are (1) the breach of contract claim; (2) the due process claims raised pursuant to 42 U.S.C. §§1983 and 1988; and (3) the tortious interference with Haiyan's contract with the College Board claim against the individual defendants only. *See id.*

Standard of Review

"Summary judgment should be granted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(a). The moving party bears the burden of proving that no factual issues exist. *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir.2010). "In determining whether that burden has been met, the court is

required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.,* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir.2006) (internal quotation marks and citation omitted).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No.3:03cv481, 2004 WL 2472280, at *1 (D.Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, No. 3:09cv1341(VLB), 2011 WL 4396704 at *6 (D. Conn. Sept. 21, 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.,* 604 F.3d 712 (2d Cir. 2010).

<u>Analysis</u>

*i.     Procedural Due Process Claim*

Haiyan argues that HPS violated her right to due process when it terminated her employment without notice and an opportunity to be heard.  *See* [Dkt. #64. Pl. Mem. at p. 32-33].  Plaintiff's argument is entirely predicated on her contention that she was a government employee of HPS.  Haiyan contends that the Appointment Letter constituted a valid contract for employment with HPS. She argues that since the Appointment Letter was for a fixed term under Connecticut law her employment could not be terminated except for just cause. *See Slifkin v. Condec Corp.*, 13 Conn.App. 538, 548-49 (1988) ("Where a contract of employment is not for a definite or determinable duration, it is terminable at the will of either party at any time and for any reason not involving impropriety" but where an "employment contract [is] for a definite or determinable term, however, may be terminated by either party only for good or just cause.") (internal quotation marks and citations omitted).  It is well established that "[a] public employee who has a right not to be fired without 'just cause'…has a property interest in her employment that qualifies for the protections of procedural due process."  *Otero v. Bridgeport Hous. Auth.*, 297 F.3d 142, 151 (2d Cir. 2002) (internal quotation marks and brackets omitted).   Haiyan therefore argues that she had a protected property interest in her employment with HPS because under Connecticut Law HPS can only terminate a fixed term employee for just cause. [Dkt. #64. Pl. Mem. at p. 34-37].  HPS argues that the Appointment Letter did not constitute an employment contract and that HPS only had a contractual relationship with the College Board as opposed to Haiyan.  See [Dkt. #57, Def.

Mem. at p. 39-41].   HPS further argues that the Appointment Letter did not establish a protected property interest in employment with HPS under the Due Process Clause.  [*Id.*].

In order to understand the nature of Haiyan's relationship with HPS and the College Board it is necessary to examine the statutory and regulatory framework underlying the College Board's Chinese Guest Teacher Program.  The Chinese Guest Teacher Program was established pursuant to the Cultural Exchange Act which empowered the State Department to authorize exchange visitor programs in which nonimmigrant visitors are permitted to enter the United States temporarily to participate in an authorized exchange visitor program such as the College Board's Chinese Guest Teacher Program.  *See* 8 U.S.C. §1101(a)(15)(J); 22 U.S.C. §2451, et seq. (1988).  Both the Cultural Exchange Act and the State Department's implementing regulations unambiguously describe the framework of the Act in terms of cultural exchange as opposed to employment.  The stated purpose of the Cultural Exchange Act is to "to increase mutual understanding between the people of the United States and the people of other countries by means of educational and cultural exchange." 22 U.S.C. §2451, et seq. (1988); *see also* 22 CFR § 62.1  (acknowledging that the purpose of the Cultural Exchange Act is to increase mutual understanding between countries and noting that "[e]ducational and cultural exchanges assist the Department of State in furthering the foreign policy objectives of the United States.").

In line with this overall purpose, the regulations specifically describe teacher exchange visitor programs in terms of cultural interchange as opposed to

employment.   Under the State Department regulations, the stated purpose of teacher exchange visitor programs is to

> promote the interchange of American and foreign teachers in public and private schools and the enhancement of mutual understanding between people of the United States and other countries. They do so by providing foreign teachers opportunities to teach in primary and secondary accredited educational institutions in the United States, to participate actively in cross-cultural activities with Americans in schools and communities, and to return home ultimately to share their experiences and their increased knowledge of the United States. Such exchanges enable visitors to understand better American culture, society, and teaching practices at the primary and secondary levels, and enhance American knowledge of foreign cultures, customs, and teaching approaches.

22 C.F.R. §62.24 (a).

Throughout the State Department regulations, foreign nationals, like Haiyan, are termed "exchange visitors" as opposed to workers or employees. With respect to teacher exchange visitor programs, the regulations conceptualize that the foreign teacher is "participat[ing] in an exchange visitor program as a full-time teacher," that the teacher is "participat[ing] in an exchange visitor program at the primary or secondary accredited educational institution," and that teachers will be "accept[ed]" into an exchange visitor program. *Id.* at §62.24.  The purpose of the Act and the nomenclature used in the implementing regulations indicate that it was Congress's intent to create a program for cultural exchange as opposed to an employment program.

This intent is further bolstered by the fact that exchange visitors, such as Haiyan, receive a J-1 nonimmigrant exchange visitor visa as opposed to a temporary nonimmigrant worker visa such as an H-1B visa. See http://travel.state.gov/visa/temp/types/types_1271.html (last visited June 12,

26

2012); *see also Glara Fashion, Inc. v. Holder*, No.11Civ.889(PAE), 2012 WL 352309, at *1 (S.D.N.Y. Feb. 2, 2012) ("Employers in the United States may petition for H–1B nonimmigrant visas on behalf of alien workers; such visas allow the worker temporary admission to the United States in order to 'perform services ... in a specialty occupation.'") (quoting 8 U.S.C. §1101(a)(15)(H)(i)(b)).   Holders of J-1 visas are categorized as exchange visitors who are "coming temporarily to the United States as a participant in a program designated by the Director of the United States Information Agency, for the purpose of teaching, instructing or lecturing, studying, observing, conducting research, consulting, demonstrating special skills, or receiving training."  8 U.S.C. §1101(a)(15)(J).  Whereas holders of an H-1B visa are categorized as "temporary workers" who are "coming temporarily to the United States to perform services" or "labor if unemployed persons capable of performing such service or labor cannot be found in this country." 8 U.S.C. §1101(a)(15)(H)(i)(b).

In addition, the language of the MOU between the College Board and HPS is consistent with purposes of the Cultural Exchange Act and the provisions of the implementing regulations in establishing a program of cultural exchange as opposed to an employment program.  For example, the MOU provides that the College Board and Hanban "entered into an agreement to place teachers from China in US schools during the 2009-2010 school year to enhance Chinese language and culture education in the United States." [Dkt. #57, Ex. 1, MOU].  The MOU also describes foreign teachers not as employees or workers but as "Guest

Teachers" and indicates that such "Guest Teachers" will be sponsored for a J-1 exchange visitor visa.  [*Id.*].

Lastly, the language of the Appointment Letter is also reflective of such purpose.  The Appointment Letter indicates that Haiyan had been appointed as a full time teacher at HPS consistent with the State Department regulations which provide that "[p]rior to the issuance of the Form DS–2019, the exchange visitor shall receive a written offer and accept in writing of a teaching position from the primary or secondary accredited educational institution in which he or she is to teach."  22 C.F.R. §62.24.  The Appointment Letter indicates that Haiyan would receive compensation "commensurate with compensation received by those teachers employed with Handem" and that HPS "will do its best to encourage this teacher to engage in cross-cultural activities outside the classroom."  [Dkt. #64-6, Pl. Ex. E].  These provisions assure that persons who enter the country under exchange visitor programs fulfill the purpose of the program rather than confer employee status on participants.

In view of the context, purpose and nomenclature of the Cultural Exchange Act, the State Department's implementing regulations, Haiyan's status as a J-1 visa holder, and the language of the MOU, Haiyan's status can only be understood as a foreign teacher participating in an exchange visitor program and not as an employee of HPS.  When viewing the Appointment Letter with reference to the statutory and regulatory framework of exchange visitor programs, it is clear that Haiyan did not have an employment contract with HPS but rather had a

contract to participate as a foreign teacher in an exchange visitor program sponsored by the College Board.

Since Haiyan did not have a contract for employment with HPS but rather a contract to participate in an exchange visitor program it would be inappropriate to look to Connecticut employment law to interpret Haiyan's purported contract. The Court is therefore not persuaded that Haiyan could only be terminated from the exchange visitor program for just cause as Haiyan contends because her appointment was for a fixed-term under Connecticut law.   Consequently, Plaintiff's theory that she had a protected property interest in her employment as a result of her status as a government employee with a fixed-term position who can only be terminated for just cause is unavailing.

Assuming without deciding that Haiyan's participation in the College Board's exchange visitor program at HPS could constitute the conferral of a government benefit,[1] the Court will now examine whether Haiyan has a protected property interest as a participant in the Chinese Guest Teacher Program.   "To determine whether a plaintiff was deprived of property without due process of law in violation of the Fourteenth Amendment, we must ... identify the property interest involved." *O'Connor v. Pierson,* 426 F.3d 187, 196 (2d Cir. 2005).   "This

---

[1] The Court notes that the College Board's Chinese Guest Teacher Program also placed Guest Teachers in private schools.  Arguably, placement as a teacher in a private school by the private non-profit College Board could not be considered the conferral of a government benefit.  The Court therefore assumes without deciding that placement as an exchange visitor in a public school could constitute the conferral of a government benefit.   *See* 22 CFR §62.24 ("Programs under this section promote the interchange of American and foreign teachers in public and *private* schools") (emphasis added).

involves a two-step process.  First, we must determine whether some source of law other than the Constitution, such as a state or federal statute, confers a property right on the plaintiff.  Once such a property right is found, we must determine whether that property right constitutes a property interest for purposes of the Fourteenth Amendment."  *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (internal quotation marks and citations omitted).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it [or a] unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it."  *Regents v. Roth*, 408 U.S. 564, 576 (1972). "The source of such interests are not to be found in the Constitution.  Rather their existence and dimensions are defined by 'existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  *Goetz v. Windsor Central School Dist.*, 698 F.2d 606, 608 (2d Cir. 1983) (quoting *Regents*, 408 U.S. at 577).

Although as discussed above Haiyan's contract should not be viewed as a contract for employment, the principles underlying the due process analysis within the employment context are nonetheless informative to the Court's analysis.  "In the employment context, a property interest arises only where the state is barred, whether by statute or contract, from terminating (or not renewing) the employment relationship *without cause.*"  *Taravella*, 599 F.3d at *134* (internal quotation marks and citations omitted).  A "property interest in employment may be the subject of a due process claim only if the plaintiff has 'a legitimate claim of

entitlement to it.'" *Etere v. City of New York*, 381 Fed. Appx. 24, 25 (2d Cir. 2010) (quoting *Regents,* 408 U.S. at 577).  "Consequently, an "abstract need, desire or unilateral expectation is not enough. Employees at will have no protectable property interest in their continued employment."  *Abramson v. Pataki*, 278 F.3d 93, 99 (2d Cir. 2002) (citation omitted).

In the instant case, neither the terms of the MOU, the Appointment letter nor the implementing regulations of the Cultural Exchange Act constitute the type of guarantee of a benefit that rises to the level of a protected property interest as both the College Board and HPS were given substantial discretion to terminate an exchange visitor or Guest Teacher from the program.  There can be no legitimate claim of entitlement to a benefit where the state retains discretionary authority over the continuation or termination of that benefit.  *See e.g., Abramson*, 278 F.3d at 100 (holding that even if agreement contained a promise to hire appellants for employment at the Javitz Center "it would not have created a property interest because the NYCCOC's discretion to hire or fire an employee was unlimited."); *Petrario v. Cutler,* 187 F.Supp.2d 26, 35 (D.Conn.2002) ("[A] property interest does not exist solely because of the importance of the benefit to the recipient. The existence of provisions that retain for the state significant discretionary authority over the bestowal or continuation of a government benefit suggests that the recipients of such benefits have no entitlement to them.") (internal quotations and citations omitted); *Russo v. City of Hartford,* 158 F.Supp.2d 214, 223 (D. Conn. 2001) ("A person does not have a property interest in the ... discretionary benefits of their employment."); *RR Village Ass'n, Inc. v. Denver Sewer Corp.,* 826

F.2d 1197, 1201-02 (2d Cir.1987) ("if state law makes the pertinent official action discretionary, one's interest in a favorable decision does not rise to the level of a property right entitled to procedural due process protection."); *White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1062 (2d Cir. 1993) ("An interest that state law permits to be terminated at the whim of another person is not a property right that is protected by the Due Process Clause.").

Here, the MOU provides both the College Board and HPS with substantial discretion over termination of a Guest Teacher from the program.  The College Board may terminate the MOU with respect to a Guest Teacher "upon misconduct, unsatisfactory performance pursuant to the District's employment policies and procedures of a Chinese Guest Teacher; failure of a Chinese Guest Teacher to complete the teaching position because of voluntary termination, including premature departure; Chinese Guest Teacher engaging in unauthorized income-producing activities; or other activities that in the judgment of IIE and/or the College Board are inconsistent with the purposes and best interests of the Chinese Guest Teacher Program."  [Dkt. #57, Ex. 1, MOU, ¶¶1.2.1-1.2.3].  HPS may terminate either upon "unsatisfactory performance (pursuant to District's employment policies and procedures) of a Chinese Guest Teacher; Chinese Guest Teacher engaging in unauthorized income-producing activities; or other activities that in the judgment of IIE and/or the College Board are inconsistent with the purposes and best interests of the Chinese Guest Teacher Program" or "misconduct of Chinese Guest Teacher or violation of federal, state or local laws."  [*Id.* at ¶¶8.2.3-8.2.4].

Under the MOU, the determination of "unsatisfactory performance" is inherently vested in the discretion of either the College Board or HPS.  In addition, the MOU expressly provides that the College Board may terminate participation in the program upon its discretionary "judgment" as to activities that are inconsistent with the "best purposes and bests interests" of the program. In order to give effect to the termination provisions of the MOU both the College Board and HPS would necessarily have to exercise their discretion and judgment. Here the broad and unlimited grant of discretion to the College Board and HPS to terminate the MOU with respect to a Guest Teacher suggests that Guest Teachers in the program have no reasonable expectation or legitimate claim of entitlement to continued participation in the program.

The State Department's implementing regulations also give substantial discretion to the sponsor of a visitor exchange program to terminate an exchange visitor's participation in that program.  *See* 22 C.F.R. §62.40.  For example, a sponsor may terminate an exchange visitor's participation in its program where the exchange visitor "violates the Exchange Visitor Program regulations and/or the sponsor's rules governing the program, if, *in the sponsor's opinion*, termination is warranted." *Id.* (emphasis added).  The regulations expressly grant the sponsor the broad and unlimited discretion to make a termination decision within its opinion.  Again, to give effect to this provision, the sponsor must necessarily exercise discretion and judgment.  The Court notes that the Appointment Letter is silent as to termination of Haiyan's appointment as a Guest Teacher at HPS and it does not limit the Board and HPS's discretion or creates a

reasonable expectation to or entitlement of continued participation in the program, much less an employment interest.  Since both the terms of the MOU and the implementing regulations provide for the exercise of discretion in the termination of an exchange visitor's participation in the program, Haiyan has failed to demonstrate that she had more than an "abstract need, desire or unilateral expectation" in the continued participation in the Guest Teacher Program.  Much like an employee at will, Haiyan has no protectable property interest in her continued participation as an exchange visitor teacher in the College Board's Chinese Guest Teacher Program.  The Court therefore grants summary judgment on Plaintiff's procedural due process claim.

In the alternative, Defendants argue that qualified immunity should apply as it was not clearly established that Haiyan had a protected property interest in employment for the school year.  See [Dkt. #57, Def. Mem. at 41].  Here even assuming that Haiyan has a protected property interest in her participation as a Guest Teacher at HPS, such an interest was not clearly established and therefore the individual defendants would be entitled to qualified immunity.  Moreover, "[E]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007).  "[T]he matter of whether a defendant official's conduct was objectively reasonable, *i.e.,* whether a reasonable official would reasonably believe his conduct did not violate a clearly established right, is a mixed question

of law and fact." *Kerman v. City of New York,* 374 F.3d 93, 109 (2d Cir.2004). "Although a conclusion that the defendant official's conduct was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder." *Id.* (citations omitted).

Here the Defendant's conduct in terminating Haiyan as a Guest Teacher pursuant to the terms of the MOU without a *Loudermill* hearing was objectively reasonable as a matter of law as a reasonable official would reasonably believe such conduct did not violate a clearly established right.  Further, Plaintiffs cites no legal authority establishing that a J-1 visa holder is a public employee entitled to a *Loudermill* hearing.  It was objectively reasonable to conclude that Haiyan was not a government employee under the terms of the MOU and the Cultural Exchange Act and therefore not entitled to such due process protections.  *See Taravella*, 599 F.3d at 135 (holding that qualified immunity applied since it was objectively reasonable to conclude that plaintiff could be fired without a hearing where employment agreement was ambiguous as to whether town could only fire plaintiff for cause).  Consequently, the individual defendants would also be entitled to the protection of qualified immunity.

### ii.   Stigma Plus Claim

"A person's interest in his or her good reputation alone, apart from a more tangible interest, is not a liberty or property interest sufficient to invoke the procedural protections of the Due Process Clause or create a cause of action under § 1983.  Instead, when dealing with loss of reputation alone, a state law

defamation action for damages is the appropriate means of vindicating that loss." *Patterson v. City of Utica*, 370 F.3d 322, 329-330 (2d Cir. 2004) (citations omitted). "Loss of one's reputation can, however, invoke the protections of the Due Process Clause if that loss is coupled with the deprivation of a more tangible interest, such as government employment.  For a government employee, a cause of action under § 1983 for deprivation of a liberty interest without due process of law may arise when an alleged government defamation occurs in the course of dismissal from government employment.  This type of claim is commonly referred to as a 'stigma-plus' claim."  *Id.* (citations omitted).

"To state a stigma-plus claim, a plaintiff must prove (1) the utterance of a statement injurious to his reputation that is capable of being proved false and that plaintiff claims is false; and (2) some tangible and material state-imposed burden in addition to the stigmatizing statement."  *Lawson v. Rochester City School Dist.*, 446 Fed. Appx. 327, 329 (2d Cir. 2011) (citations omitted).  Plaintiff is also required to demonstrate that the stigmatizing statements were made public.  *See Brandt v. Board of Co-op Educ. Servs., Third Supervisory Dist., Suffolk*, 820 F.2d 41, 44 (2d Cir. 1987).

Plaintiff essentially concedes that her stigma-plus claim is predicated on her contention that she was a government employee of HPS as she acknowledges that that she is bringing her stigma-plus claim "in the public employment context."  *See* [Dkt. #64, Pl. Mem. at p. 38-39].  Plaintiff argues that she was terminated from her employment by HPS "on the pretext that she had committed misconduct, and that the Defendants communicated this stigmatizing

statement to the College Board that same day, without ever affording the Plaintiff notice or opportunity to be heard as to the same." [*Id.*]. Plaintiff further argues that she "did not in fact commit misconduct as alleged by the Defendats [sic]." [*Id.*]. HPS argues that Plaintiff's stigma plus claim must fail since it made no stigmatizing comment as such comment was true and that Plaintiff has admitted to engaging in all the conduct for which she was ultimately terminated such as involvement in a physical altercation with Li Li and her resulting arrest for disorderly conduct and assault. *See* [Dkt. #57, Def. Mem. at p. 45-47]. Defendants also suggest that Plaintiff fails to satisfy the "plus" requirement since Plaintiff would have only been entitled to stay for the duration of the school year under the Chinese Guest Teacher Program. [*Id.* at 47]. Defendants argue that "[t]here is simply no law holding that a foreign exchange teacher on a [not to exceed] one year assignment has a liberty interest entitling her to a post deprivation name clearing hearing after being terminated based on an arrested for assaulting a fellow exchange teacher and later admitting that there was probable cause for the arrest." [*Id.*].

Here, Plaintiff's stigma-plus claim is unavailing because she has not demonstrated that she was an employee of HPS and therefore suffered a loss of government employment. As discussed above, Haiyan was not a government employee but rather an exchange visitor participating in a teacher exchange visitor program. Consequently as Defendants argue, Haiyan fails to demonstrate that she has fulfilled the "plus" requirement. Although it is not "entirely clear what the plus is" the Second Circuit has noted that "Supreme Court has given

indications that perhaps only those who are defamed while in the course of being terminated from government employment can state a cause of action for deprivation of a liberty interest." *Valmonte v. Bane*, 18 F.3d 992, 1002 (2d Cir. 1994).   Here, Haiyan has not demonstrated that she was terminated from government employment.   As discussed above, Haiyan was terminated from participating in a visitor exchange program and therefore has not demonstrated the "deprivation of a more tangible interest such as government employment" sufficient to state a stigma-plus claim.   Defendants are therefore correct in their contention there is simply no caselaw holding that a participant in a foreign exchange program is entitled to the protections afforded under the Due Process Clause in connection with a stigma-plus claim.

Even assuming Haiyan had fulfilled the "plus" requirement, as Defendants contend, where a statement "was not false, it cannot form the basis for a stigma plus claim, however stigmatizing it might appear to be." *DiBlasio v. Novello*, 413 Fed. Appx. 352, 356 (2d Cir. 2011) (citing *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir. 1980)); *see also Strasburger v. Bd. Of Educ.*, 143 F.3d 351, 356 (7th Cir. 1998) ("True but stigmatizing statements that preclude further government employment do not support this type of claim.   Nor do statements of opinion, even stigmatizing ones, fi they do not imply false facts. We also require the statements to come from the mouth of a public official."). Here, a reasonable juror would undoubtedly conclude that when HPS informed the College Board that Haiyan had been involved in an altercation with Li Li and

had been arrested that those statements were true and therefore could not form the basis of a stigma-plus claim.

Lastly, a reasonable jury would not find that HPS made the statements public when they informed the College Board of the altercation and arrest considering that (i) the College Board and HPS were in a contractual relationship with respect to the Haiyan as a participant in the Chinese Guest Teacher Program; (ii) HPS was obligated under the MOU to provide the College Board with "complete and accurate documentation pertaining to the Chinese Guest Teacher;" and (iii) the College Board was obligated to "maintain regular communication with the Chinese Guest Teacher and monitor their work progress" under the MOU. [Dkt. #57, Ex. 1, MOU at ¶ ¶6, 1.2.1-1.2.3].  The Court therefore grants summary judgment on Plaintiff's stigma-plus claim.

In the alternative, Defendants argue that qualified immunity should apply as it was not clearly established that Plaintiff had a protected stigma plus liberty interest and that the actions of the individual defendants were objectively reasonable.  *See* [Dkt. #57, Def. Mem. at p. 47-48].  It was undoubtedly not clearly established that the deprivation of the "right" to participate in an exchange visitor program constitutes a protected stigma plus liberty interest.   Here the Defendant's conduct in terminating Haiyan as a Guest Teacher pursuant to the terms of the MOU and informing the College Board of the altercation and arrest without offering a post-deprivation name-clearing hearing was objectively reasonable as a matter of law as a reasonable official would reasonably believe such conduct did not violate a clearly established right.  Once again, the Court

notes that the Plaintiff has cited no legal authority establishing such a right under analogous facts.  It was objectively reasonable to conclude that Haiyan was a not government employee under the terms of the MOU and the Cultural Exchange Act and therefore not entitled to such due process protections.  Consequently, the individual defendants would once again be entitled to the protection of qualified immunity.

### iii.    Breach of Contract

Haiyan argues that Defendant HPS breached its employment contract with her by terminating her without just cause.  As discussed above, Haiyan assumes without establishing that she was a government employee of HPS and therefore contends that under Connecticut law since her purported contract for employment was for a fixed-term she could only be terminated for just cause. Plaintiff further argues that Defendant Hernandez, who signed the Appointment Letter, had the authority to bind the District to an employment contract.  *See* [Dkt. #64, Pl. Mem. at p. 23-31].  Defendants argue that Plaintiff is "unable to establish the existence of the employment contract" with HPS.  *See* [Dkt. #57, Def. Mem. at P. 24].  Defendants also argue that the Appointment Letter could not have formed an employment contract because the Letter's author, Hamlet Hernandez, Assistant Superintendent, did not have the authority to execute a just cause employment contract.  Alternatively, Defendants posit that even if the Court were to find that the Letter formed a just cause employment contract, HPS did not breach the contract because just cause existed for Haiyan's termination.  [*Id.* at p. 29-31].

As discussed above, the Defendants are correct in their contention that the Appointment Letter did not constitute a conditional contract for employment. Instead for the reasons stated above, *supra* section i, the Appointment Letter constituted a contract to participate in a teacher exchange visitor program.   As noted above, since Haiyan did not have a contract for employment with HPS it would be inappropriate to look to Connecticut employment law to interpret Haiyan's purported contract.  The Court is therefore not persuaded that Haiyan could only be terminated from the exchange visitor program for just cause as Haiyan contends because her appointment was for a fixed-term under Connecticut law.   Moreover, the Appointment Letter itself is silent as to termination.   As discussed above, the MOU and the State Department regulations contain discretionary provisions regarding termination which cannot be construed as permitting only termination for just cause.  Consequently, Plaintiff's theory that Defendants breached her employment contract by terminating her without just cause is unavailing and the Court need not address the parties' arguments as to whether HPS had "just cause" to terminate Haiyan under Connecticut law.  The Court therefore grants summary judgment on Plaintiff's breach of contract claim.

### iv.    Tortious Interference of Contract

Haiyan argues that Defendants tortuously interfered with her contract with the College Board.  Haiyan argues that she entered into a contractual relationship with the College Board to participate in the Chinese Guest Teacher Program, that as part of her participation in the program she was entitled to receive a J-1 visa

41

and be provided with compensation from a school district in the United States. [Dkt. #64, Pl. Mem. at p. 50-51].   Plaintiff further argues that the individual defendants were aware of her contractual relationship with the College Board, conspired to take action to terminate "not only the Plaintiff's contract with the District, but her participation in the College Board's guest teacher program" as a result of her pay dispute with HPS.  [*Id.* at p, 51].   Haiyan contends that the individual defendants supplied the College Board with a letter making false claims that she had committed professional misconduct in order to convince the College Board to terminate the Plaintiff's participation in the Guest Teacher Program.  [*Id.*].  Defendants argue that the "record is devoid of such a contract with the College Board" and that the College Board merely sponsored a Guest Teacher Program which Haiyan was a participant in.  [Dkt. #69, Def. Reply Mem. at p. 17].  Defendants also argue that Plaintiff cannot demonstrate that the individual defendants intended to interfere with Plaintiff's relationship with the College Board nor can Plaintiff demonstrate that the individual defendant's actions were tortious. [Dkt. #57, Def. Mem. at p. 55].   Lastly, Defendant argues that tort liability cannot be applied to the individual defendants as an agent cannot be held liable for interference where he acted within scope of his duty and did not use the corporate power improperly for personal gain.  [*Id.* at 53].

Under Connecticut law, "[a] claim for intentional interference with contractual relations requires the plaintiff to establish: (1) the existence of a contractual or beneficial relationship; (2) the defendant's knowledge of that relationship; (3) the defendant's intent to interfere with the relationship; (4) that

the interference was tortious; and (5) a loss suffered by the plaintiff that was caused by the defendant's tortious conduct." *Rioux v. Barry,* 283 Conn. 338, 351, 927 A.2d 304 (2007) (citations omitted). "[N]ot every act that disturbs a contract or business expectancy is actionable.... [A]n action for intentional interference with business relations ... requires the plaintiff to plead and prove at least some improper motive or improper means.... [A] claim is made out [only] when interference resulting in injury to another is wrongful by some measure beyond the fact of the interference itself." *Larsen Chelsey Realty Co. v. Larsen,* 232 Conn. 480, 502 n. 24, 656 A.2d 1009 (1995) (Internal quotation marks and citations omitted).

"[F]or a plaintiff successfully to prosecute such an action it must prove that ... the defendant was guilty of fraud, misrepresentation, intimidation or molestation ... or that the defendant acted maliciously ... In the context of a tortious interference claim, the term malice is meant not in the sense of ill will, but intentional interference without justification ... In other words, the [plaintiff] bears the burden of alleging and proving lack of justification on the part of the [defendant]." *American Diamond Exchange, Inc. v. Alpert*, 101 Conn.App. 83, 90-91 (2007) (internal quotation marks and citations omitted). Connecticut courts look to Section 767 of 4 Restatement (Second) of Torts which "provides in relevant part: 'In determining whether an actor's conduct in intentionally interfering with a contract or a prospective contractual relation of another is improper or not, consideration is given to the following factors: (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which

the actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations between the parties.'" *Id.*

"However, it is well-settled that the tort of interference with contractual relations only lies when a third party adversely affects the contractual relations of two *other* parties." *Wellington Sys., Inc. v. Redding Group, Inc.,* 49 Conn. App. 152, 168 (1998), cert. denied, 247 Conn. 905, 720 A.2d 516 (1998) (Emphasis in original; internal quotation marks omitted). "[T]here can be no intentional interference with contractual relations by someone who is directly or indirectly a party to the contract. [T]he general rule is that the agent may not be charged with having interfered with a contract of the agent's principal." *Appleton v. Bd. of Educ.,* 53 Conn. App. 252, 267 (1999), rev'd in part on other grounds, 254 Conn. 205, 757 A.2d 1059 (2000) (Internal quotation marks and citation omitted). "[A]n agent acting legitimately within the scope of his authority cannot be held liable for interfering with or inducing his principal to breach a contract between his principal and a third party, because to hold him liable would be, in effect, to hold the corporation liable in tort for breaching its own contract...." *Wellington,* 49 Conn. App. at 168 (Internal quotation marks and citations omitted). In other words, an exception to the general rule applies if the agent "did not act legitimately within his scope of duty but used the corporate power improperly for personal gain." *Id.* (Internal quotation marks and citation omitted).

As Defendants contend, Plaintiff has not proffered on summary judgment a contract with the College Board.  The only contract in evidence is the MOU which was executed between the College Board and HPS.  Haiyan was not a signatory to the MOU.  In the absence of any evidence indicating that Haiyan had a separate contract with the College Board to be a participant in the Chinese Guest Teacher Program, a reasonable jury could not conclude that there was any tortious interference.  To the extent that Haiyan was a third party beneficiary of the MOU between the College Board and HPS, there could be no liability against HPS for tortuously interfering with the MOU since it was a party to the contract.  *See Appleton,* 53 Conn. App. at  267 ("[T]here can be no intentional interference with contractual relations by someone who is directly or indirectly a party to the contract.").  To the extent that Plaintiff is claiming that the individual defendants should be liable for tortuous interference of the MOU to which HPS was a party, a reasonable jury would not conclude that the individual defendants could be held liable since there is no evidence that any of them were not acting legitimately within the scope of his or her duty nor is there any evidence that any individual defendant used the corporate power improperly for personal gain.

Even assuming that Haiyan had a separate contract with the College Board, a reasonable jury would not conclude that the Defendants' purported interference was tortious as there is no evidence that Defendants held some improper motive or means or that Defendants acted maliciously and without justification.   Here, it is undisputed that Haiyan was involved in a physical alteration and was arrested on charges of disorderly conduct and assault.   Although Haiyan contends that Li

Li started the fight and she acted in self-defense, it was not improper for HPS to conclude that it should inform the College Board of Haiyan's conduct including her arrest nor was it improper for HPS to invoke its prerogative under the MOU to terminate Haiyan as a Guest Teacher upon its determination of Haiyan's unsatisfactory performance pursuant to its employment policies and procedures and its determination that Haiyan engaged in misconduct.   *See* [Dkt. #57, Ex. 1, MOU, ¶¶8.2.3-8.2.4].   There simply can be no improper motive or means where the MOU expressly provided HPS with the ability to terminate Haiyan as a Guest Teacher upon its discretionary determination of unsatisfactory performance or misconduct.   Accordingly, the Court grants summary judgment on Plaintiff's tortious interference of contract claim.

### Conclusion

Based upon the above reasoning, the Defendants' [Dkt. #55] motion for summary judgment is GRANTED and all of Plaintiff's claims have been accordingly dismissed.  The Clerk is directed to enter judgment in favor of Defendants and close the case.

IT IS SO ORDERED.

_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge

Dated at Hartford, Connecticut: June 19, 2012

46